REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
Post Office Box 13315, PMB #148
Oakland, California 94661
Telephone:  (510) 237-9700
Facsimile:  (510) 237-4616
Email: Reggiet2@aol.com

Attorney for Plaintiffs
DENNIS PATRICK

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

DENNIS PATRICK and GRETHA PERRY,
Individually & on behalf of all others
similarly situated,

          Plaintiffs,

v.

HITACHI, LTD,

          Defendant.

Case No. **C12-6172**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs brings this civil action on behalf of himself and all others similarly situated against the above-named Defendant and, demanding a trial by jury, complain and allege as follows:

## I.  INTRODUCTION

1.    As alleged below, Defendant and its co-conspirators engaged in a comprehensive conspiracy to fix, raises, maintains, or stabilizes the prices of, or allocates the market for, dynamic random access memory ("DRAM").

2.     During the class period, Defendant and its co-conspirators manufactured DRAM chips and assembled those chips into DRAM modules for use in computers and other DRAM containing devices.

3.     Defendant and its co-conspirators fixed the price of DRAM sold in the United States by communicating sensitive price and supply information among themselves on nearly a daily basis.

4.     More than 100 employees of Defendant and co-conspirator companies participated in illicit conducting during the class period, including providing or receiving information related to pricing and sales, production capacity, output, and technology roadmaps.

5.     Plaintiffs are a natural person who indirectly purchased price-fixed DRAM in module or chip form or as part of a computer, printer, graphic card, game system, or other DRAM containing device in the United States.

6.     Because the overcharges for DRAM were passed from direct purchasers to indirect purchasers, Plaintiff and the class they purport to represent paid more for DRAM and DRAM containing devices than he would have paid absent the conspiracy, and was thereby harmed. Defendant and its co-conspirators understood and intended that indirect purchasers would bear the harm created by the price fixing conspiracy.

## II.     JURISDICTION AND VENUE

7.     This complaint is filed under Sections 4, 4C, 12 and 16 of the Clayton Act, 15 U.S.C. § 15, 22 and 26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15, U.S.C. § 1, to recover damages under state antitrust and consumer protection laws, and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of Defendant and its co-conspirators' violations of those laws.

8.     The Court has jurisdiction over the federal claim under 28 U.S.C. §§ 1331 and 1337. The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy. The Court also has jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount

1  in controversy for the Class exceeds $5,000,000 and at least one member of the class is a citizen

2  of a State ad the Defendant is a citizen or subject of a foreign State.

3      9.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391

4  because Defendant and its co-conspirators reside, transact business, or are found within this

5  District, and a substantial part of the events giving rise to the claims arose in this District.

6      10.     The activities of Defendant and its co-conspirators, as described herein, were

7  within the flow of, were intended to, and did have a substantial effect on the interstate commerce

8  of the United States. The actions of Defendant and its co-conspirators, in furtherance of their

9  conspiracy, substantially affected commerce in California, and as such, Defendant and co-

10 conspirators have purposely availed themselves of the laws of California.

11                          **III.   TOLLING AGREEMENT**

12     11.     On June 16, 2006, a tolling agreement was entered between co-lead counsel for

13 the indirect purchaser plaintiffs in *In Re Dynamic Random Access Memory (DRAM) Antitrust*

14 *Litigation*, MDL No. 1486, and Defendant. Since that time, the Plaintiffs have investigated the

15 claims alleged in this complaint and have reached a settlement agreement with Defendant that

16 will be presented to the Court.

17                          **IV.   DEFINITIONS**

18     12.     As used herein, the term "Dynamic Random Access Memory" or "DRAM"

19 includes extended data out DRAM (EDO DRAM), fast-page mode DRAM (FPM DRAM),

20 reduced latency DRAM (RLDRAM), synchronous DRAM (SDRAM), Rambus DRAM

21 (RDRAM), asynchronous DRAM (ASYNC) and double data rate DRAM (DDR DRAM),

22 including modules containing same. For purposes of this Complaint, "DRAM" does not include

23 static random access memory (SRAM).

24     13.     As used herein, products containing DRAM include computers, such as desktops,

25 laptops (or notebooks), servers, and workstations, as well as PDAs, telecommunication devices,

26 set-top boxes, video game consoles, printers, copiers, and facsimile machines ("DRAM

27 containing devices").

28

---

CLASS ACTION COMPLAINT                                                    3

14. As used herein, "DRAM chip" means an individual electronic microchip or integrated circuit that is used to store digital information and provide high-speed storage and retrieval of data.

15. As used herein, "DRAM module" means DRAM in the form of multiple chips glued together on a circuit board.

16. As used herein, the term "OEM" means any original equipment manufacturer of computers. OEMs include, but are not limited to, Dell, Gateway, Apple, IBM, Compaq and Hewlett Packard.

17. As used herein, the term "Module Maker" means those manufacturers, other than Defendant and its co-conspirators that assembled loose DRAM chips into DRAM modules.

18. As used herein, the term "class period" means from January 1, 1998 through December 31, 2002.

19. As used herein, the "indirect purchase of DRAM" includes both the indirect purchase of price-fixed DRAM in module or chip form and the purchase of price-fixed DRAM as a component of a computer, printer, graphic card, game system, or other DRAM containing device in the United States.

## V. THE PARTIES

### A. The Plaintiffs

21. Plaintiff Dennis Patrick, a California resident, indirectly purchased DRAM from Defendant, its co-conspirators, or both during the class period and was injured as a result of Defendant and its co-conspirators' illegal conduct.

22. Plaintiff Gretha Perry, a California resident, indirectly purchased DRAM from Defendant, its co-conspirators, or both during the class period and was injured as a result of Defendant and its co-conspirators' illegal conduct.

### B. The Defendant

23. Defendant Hitachi, Ltd. is a business entity organized under the laws of Japan, with its principal place of business at 6-6 Marunouchi 1-chome, Chivoda-ku, Tokyo, 100-8280,

Japan. During the time period covered by this Complaint, Defendant Hitachi, Ltd. manufactured, sold, and distributed DRAM to customers throughout the United States.

## C.   Co-Conspirators

24.   Micron Technology, Inc. is a Delaware corporation, with its principal place of business at 8000 South Federal Way, Boise, Idaho. During the time period covered by this Complaint, Micron Technology, Inc. manufactured, sold, and distributed DRAM throughout the United States.

25.   Micron Semiconductor Products, Inc. is a wholly owned and controlled subsidiary of Micron Technology, Inc., with its principal place of business at 8000 South Federal Way, Boise, Idaho. During the time period covered by this Complaint, Micron Semiconductor Products, Inc. sold and distributed DRAM to customers throughout the United States, including sales through its Crucial Technology division. Micron Technology, Inc., Micron Semiconductor Products, Inc., and the Crucial Technology division are referred to collectively herein as "Micron."

26.   Infineon Technologies AG is a German corporation, with its principal place of business at AM Campeon 1-12, D-85579, Neubiberg, Bavaria, Germany. During the time period covered by this Complaint, Infineon Technologies AG manufactured, sold, and distributed DRAM throughout the United States. On May 1, 2006, Infineon Technologies AG carved out its DRAM business as a separate company called Qimonda AG.

27.   Infineon Technologies North America Corp. is a wholly owned and controlled subsidiary of Infineon Technologies AG, with its principal place of business at 640 North McCarthy Boulevard, Milpitas, CA 95035. During the time period covered by this Complaint, Infineon Technologies North America Corp. sold and distributed DRAM to customers throughout the United States. Infineon Technologies AG, Infineon Technologies North America Corp. and Qimonda AG are referred to collectively herein as "Infineon."

28.   Hynix Semiconductor, Inc. is a business entity organized under the laws of South Korea, with its principal place of business at 2091, Gyeongchung-daero, Bubal-eub, Ichon-si,

1  Gyeonggi-do, Korea. During the time period covered by this Complaint, Hynix Semiconductor,
2  Inc. manufactured, sold, and distributed DRAM to customers throughout the United States.

3      29.  Hynix Semiconductor America, Inc. is a wholly owned and controlled subsidiary
4  of Hynix Semiconductor, Inc., with its principal place of business at 3101 North First Street, San
5  Jose, California. During the time period covered by this Complaint, Hynix Semiconductor
6  America, Inc. sold and distributed DRAM to customers throughout the United States. Hynix
7  Semiconductor, Inc. and Hynix Semiconductor America, Inc. are referred to collectively herein
8  as "Hynix."

9      30.  Mitsubishi Electric Corporation is a business entity organized under the laws of
10  Japan, with its principal place of business at Tokyo Building 2-7-3, Marunouchi, Chiyoda-ku,
11  Tokyo 100-8310, Japan. During the time period covered by this Complaint, Mitsubishi Electric
12  Corporation, Inc. manufactured, sold, and distributed DRAM to customers throughout the United
13  States.

14      31.  Mitsubishi Electric & Electronics USA, Inc. is a wholly owned and controlled
15  subsidiary of Mitsubishi Electric Corporation. Mitsubishi Electric & Electronics USA, Inc. is
16  headquartered at 5665 Plaza Drive, Cypress, California. Mitsubishi Electric & Electronics USA,
17  Inc. is a business entity organized under the laws of Delaware, with its principal place of
18  business at 500 Corporate Woods Parkway, Vernon Hill, IL 60061. During the class period,
19  Mitsubishi Electric & Electronics USA, Inc. manufactured, sold, and distributed DRAM to
20  customers throughout the United States. Mitsubishi Electric Corporation and Mitsubishi Electric
21  & Electronics USA, Inc. are referred to collectively herein as "Mitsubishi."

22      32.  Toshiba Corporation is a business entity organized under the laws of Japan, with
23  its principal place of business at 1-1 Shibaura, 1-chrome Minato-ku, Tokyo 105-8001, Japan.
24  During the class period, Toshiba Corporation manufactured, sold, and distributed DRAM to
25  customers throughout the United States.

26      33.  Toshiba America Electronic Components, Inc. is a wholly owned and controlled
27  subsidiary of Toshiba Corporation, with its principal place of business at 19900 MacArthur
28  Boulevard, Suite 400, Irvine, California. During the class period, Toshiba America Electronic

Components, Inc. manufactured, sold, and distributed DRAM to customers throughout the United States. Toshiba Corporation and Toshiba America Electronic Components, Inc. are referred to collectively herein as "Toshiba."

34. Samsung Electronics Co. Ltd. is a business entity organized under the laws of South Korea, with its principal place of business at Samsung Electronics Bldg., 1320-10 Seocho 2-dong, Seocho-gu, Seoul, Korea. During the time period covered by this Complaint, Samsung Electronics Co. Ltd. manufactured, sold, and distributed DRAM to customers throughout the United States.

35. Samsung Semiconductor, Inc. is a wholly owned and controlled subsidiary of Samsung Electronics Co. Ltd. with its principal place of business at 3655 North First Street, San Jose, California. During the time period covered by this Complaint, Samsung Semiconductor, Inc. sold and distributed DRAM to customers throughout the United States. Samsung Electronics Co. Let., and Samsung Semiconductor, Inc. are referred to collectively herein as "Samsung."

36. Mosel Vitelic, Inc. is a business entity organized under the laws of Taiwan, with its principal place of business at No. 1, Creation Rd. 1, Science-Based Industrial Park, Hsinchu, Taiwan, R.O.C. During the time period covered by this Complaint, Mosel Vitelic, Inc. manufactured, sold, and distributed DRAM to customers throughout the United States.

37. Mosel Vitelic (USA), Inc. was a wholly owned and controlled subsidiary of Mosel Vitelic Inc., with its principal place of business at 3910 North First Street, San Jose, California. During the time period covered by this Complaint, Mosel Vitelic (USA), Inc. sold and distributed DRAM to customers throughout the United States. Mosel Vitelic, Inc. and Mosel Vitelic (USA), Inc. are referred to collectively herein as "Mosel Vitelic" or "Mosel."

38. Nanya Technology Corporation is a business entity organized under the laws of Taiwan, with its principal place of business at HWA YA Technology Park, 669, Fu Hsing 3rd Rd., Kueishan, Taoyuan, Taiwan, R.O.C. During the time period covered by this Complaint, Nanya Technology Corporation manufactured, sold, and distributed DRAM to customers throughout the United States.

39.     Nanya Technology Corporation USA, Inc. is a wholly owned and controlled subsidiary of Nanya Technology Corporation, with its principal place of business at 5104 Old Ironsides Drive, Suite 113, Santa Clara, California. During the time period covered by this Complaint, Nanya Technology Corporation USA, Inc. sold and distributed DRAM to customers throughout the United States. Nanya Technology Corporation and Nanya Technology Corporation USA, Inc. are referred to collectively herein as "Nanya."

40.     Winbond Electronics Corporation is a business entity organized under the laws of Taiwan, with its headquarters at No. 8, Keya 1st Rd., Daya Dist. Central Taiwan Science Park, Taichung City, Taiwan, R.O.C. During the time period covered by this Complaint, Winbond Electronic Corporation manufactured, sold, and distributed DRAM to customers throughout the United States.

41.     Winbond Electronic Corporation America, Inc. is a wholly owned and controlled subsidiary of Winbond Electronics Corporation, with its principal place of business at 2727 North First Street, San Jose, California. During the time period covered by this Complaint, Winbond Electronics Corporation America, Inc. sold and distributed DRAM to customers throughout the United States. Winbond Electronics Corporation and Winbond Electronics Corporation America, Inc. are referred to collectively herein as "Winbond."

42.     Elpida Memory, Inc. is a business entity organized under the laws of Japan, with its principal place of business at Sumitomo Seimei Yaseu Bldg., 3F, 2-1 Yaseu 2-chome, Chuo-ku, Tokyo 104-0028, Japan. During the time period covered by this Complaint, Elpida Memory, Inc. manufactured, sold, and distributed DRAM to customers throughout the United States.

43.     Elpida Memory (USA), Inc. is a wholly owned and controlled subsidiary of Elpida Memory, Inc., with its principal place of business at 1175 Sonora Court, Sunnyvale, California. During the time period covered by this Complaint, Elpida Memory (USA), Inc. sold and distributed DRAM to customers throughout the United States. Elpida Memory, Inc. and Elpida Memory (USA), Inc. are referred to collectively herein as "Elpida."

44.     NEC Electronics America, Inc. ("NEC") was a wholly owned and controlled subsidiary of NEC Electronics Corporation, with its principal place of business at 2880 Scott

1  Boulevard, Santa Clara, California and its manufacturing plant in Roseville, California. During

2  the time period covered by this Complaint, NEC sold and distributed DRAM to customers

3  throughout the United States.

4      45.      The acts charged in this Complaint were done by Defendant and its co-

5  conspirators, or were authorized, ordered or done by their respective officers, agents, employees

6  or representatives while actively engaged in the management of Defendant and co-conspirators'

7  business or affairs.

8      46.      Defendants and co-conspirators named herein acted as the agent or joint venture

9  of, or for the other Defendant and co-conspirators with respect to, the acts, violations and

10  common course of conduct alleged herein.

11                  **VI.    CLASS ACTION ALLEGATIONS**

12      47.      Plaintiffs bring this suit as a class action pursuant to Rules 23(b) (2) and 23(b) (3)

13  of the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class ("the

14  Class") composed of and defined as follows:

15              All natural persons and non-governmental entities, who, at any

16              time during the period January 1, 1998 through December 31,

17              2002, purchased DRAM anywhere in the United States indirectly

18              from Defendant or its co-conspirators. Specifically excluded from

19              this Class are Defendant and its co-conspirators, their officers,

20              directors or employees and any entity in which they have a

21              controlling interest; and any of their affiliates, legal

22              representatives, heirs of assigns.

23              Also excluded are any federal, state or local governmental entities,

24              any judicial officer presiding over this action and the members of

25              his/her immediate family and judicial staff, and any juror assigned

26              to this action.

27      48.      This action has been brought and may be properly maintained as a class action

28  pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

CLASS ACTION COMPLAINT                                                     9

a. The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

b. Based upon the nature of the trade and commerce involved and the number of indirect purchasers of DRAM, the members of the Class number in the millions and are sufficiently numerous that joinder of all Class members is not practicable;

c. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs indirectly purchased DRAM from Defendants or its co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class;

d. The following common questions of law or fact, among others, exist as to the members of the Class:

    i. Whether Defendant and its co-conspirators formed and operated a combination or conspiracy to fix, raise, maintained, or stabilize the prices of, or allocate the market for, DRAM;

    ii. Whether the combination or conspiracy caused DRAM prices to be higher than they would have been if the absence of Defendant and its co-conspirators' conduct;

    iii. The operative time period of Defendant and its co-conspirators' combination or conspiracy;

    iv. Whether Defendant and its co-conspirators' conduct caused injury to the business or property of Plaintiffs and the members of the Class;

    v. The appropriate measure of the amount of damages suffered by the Class;

    vi. Whether Defendant and co-conspirators' conduct violates Section 1 of the Sherman Act;

vii.   Whether Defendant and co-conspirators' conduct violates Sections 16720 and 17200 of the California Business and Professions Code; and

viii.   The appropriate nature of class-wide equitable relief.

e.   These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

f.   Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs have no interests that are antagonistic to other members of the Class and have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class;

g.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court;

h.    Defendant and its co-conspirators have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

i.    In the absence of a class action, Defendant and its co-conspirators would be unjustly enriched because they would be able to retain the benefits and fruits of their wrongful conduct.

## VII.    NATURE OF TRADE AND COMMERCE

49.    Throughout the period of time covered by this Complaint, Defendant and its co-conspirators engaged in the business of marketing and selling DRAM throughout the United States. Worldwide sales of DRAM totaled approximately $14 billion in 2001 with the United States accounting for a significant share of the market. There are more than $5 billion of DRAM sales annually in the United States. The top six manufacturers control over 90% of the worldwide market.

50.    The co-conspirators are the largest manufacturers and sellers of DRAM in the United States market. More than seventy percent (70%) of the DRAM market was controlled by co-conspirators Micron, Infineon, Hynix and Samsung during the class period. Defendant and the remaining co-conspirators made up the bulk of the remaining 30% of the market.

51.    California is the largest market in the world for DRAM. It is the world-wide center of the computer industry and other industries that depend upon the DRAM market. Statements concerning prices and market conditions for DRAM were disseminated by Defendant and co-conspirators from and into California on a regular and continuous basis. The conspiracy was centered in, carried out, implemented, and perfected in California. All members of the Class, whether or not California residents, are entitled to recover under California law.

## A.    What is DRAM?

52.    DRAM is the dominant, most common form of computer memory. "Random Access Memory" means that the data, stored in the form of 0s and 1s, can be accessed directly from any part of the memory, rather than having to proceed sequentially from some startling

place. DRAM is called "dynamic" because it must have its storage cells refreshed or given a new electronic charge every few milliseconds.

53. DRAM has no free-standing use. In other words, it must be inserted into a device such as a computer to serve any function.

54. DRAM is a commodity. It has been described as "like milk or bread," and that it "varies little from manufacturer to manufacturer."

**B. How is DRAM Manufactured and Sold to Direct Purchasers?**

55. DRAM production has been dominated by a handful of leading manufacturers – namely, Defendant and its co-conspirators.

56. Defendant and its co-conspirators manufactured DRAM in fabrication plants. There, "wafers" are cut into individual chips, called "dice." Once the dice have the electronics printed on them, the chip is complete.

57. Because DRAM has no independent utility, the value of, and thus demand for, DRAM is derived through the demand for products that need volatile memory.

58. Most DRAM chips are assembled by Defendant and its co-conspirators (or their contract labor) into DRAM modules in order to be used in DRAM-containing devices. DRAM modules are a packaging option necessitated by, and developed for, the computer segment of the electronics market.

59. A DRAM module is made from DRAM chips, a printed circuit board ("PCB"), and a bonding agent to attach the chips to the PCB. The vast majority of the cost of a DRAM module is the cost of chips.

60. The close relationship between modules and chips is reflected by the price parity between them. At any given time, the price of modules was only slightly above aggregate price of the loose chips mounted on the PCB.

**C. How do Direct Purchasers Buy DRAM?**

61. Although DRAM manufacturers such as Micron sold a limited amount of DRAM through its retail arm (Crucial), the vast majority of DRAM was sold to OEMs either through contracts that were negotiated bi-weekly or monthly, or by way of the spot market. Because

1    Defendant and its co-conspirators fixed prices in the spot and contract markets, all direct

2    purchasers were affected by the price-fixing conspiracy.

3       62.     OEMs purchased DRAM on a contractual basis to ensure availability of parts and

4    to guard against unexpected price increases.

5       63.     During the class period, the contract market comprised approximately 80% of the

6    DRAM sold for use in computers.

7       64.     Because OEMs required vast quantities of DRAM to be readily available, the

8    Defendant and its co-conspirators established hubs for purposes of storing DRAM near the

9    OEMs' facilities. The OEMs were not charged for the DRAM until they actually pulled

10    inventory out of the hub. By manipulating the inventory in these hubs, Defendant and its co-

11    conspirators could effectively create artificial shortages for the OEMs.

12       65.     Smaller direct purchasers purchased their DRAM from Defendant and its co-

13    conspirators on the "spot market." The spot market is a purchasing channel primarily utilized by

14    independent distributors and others who buy and sell DRAM for immediate delivery. OEMs also

15    purchase DRAM from the spot market when prices and supply/demand issues so dictate.

16    Although the major manufacturers of DRAM sell primarily to the contract market, the spot

17    market absorbs production overages and otherwise unsold DRAM. The DRAM manufacturers

18    carefully track spot market pricing not only because of the revenue derived from spot market

19    sales, but, more importantly, because spot market pricing serves as an important benchmark for

20    contract negotiations with the OEMs.

21       66.     During the class period, all DRAM pricing was determined from a benchmark

22    price commonly referred to as the "spot price." This spot price was compiled and published daily

23    by data services such as dramexchange.com or Converge. Each day, Defendant and its co-

24    conspirators received these lists and used them as the benchmark for pricing to all purchasers.

25       67.     As one Infineon document declared: "ALL PRICING IS DEPENDENT ON

26    SPOT PRICE." (Emphasis in original.) Another Infineon document notes that spot pricing is a

27    leading indicator for contract pricing and that the "contract price tracks spot price with lag phase

28    depending on negotiation period."

68.    The contract and spot markets were closely correlated: (Image unavailable)

69.    The spot and contract markets are sufficiently interrelated so that by manipulating sales made to the spot market; Defendant and its co-conspirators could bolster contract market pricing. Mosel Vitelic's Kevin Chen remarked on this in a November 1999 internal email, "[W]e have visited … other vendors in this period … their strategies are to keep spot price high so that they can get a better contract price … I think the way to solve price gap is to sell key account more parts and reduce spot percentage as soon as possible."

### D.    How Do the Indirect Purchasers Buy DRAM?

70.    Plaintiffs and the class they purport to represent bought DRAM or DRAM containing devices from direct purchasers such as Dell, Apple, Gateway or downstream through resellers such as Best Buy, Costco, Radio Shack. In most cases, indirect purchasers bought DRAM as part of a DRAM containing device such as a computer.

### E.    Plaintiffs' Injuries

71.    Because Defendant and its co-conspirators controlled the market for DRAM, they were able to artificially elevate the price of DRAM and impose a significant overcharge on direct purchasers. Because there are no substitutes for computers and other DRAM containing devices, OEMs were able to pass through Defendant and its co-conspirators' illicit overcharge to indirect purchasers.

72.    Plaintiffs were thus injured by paying supra-competitive prices for DRAM and devices containing DRAM.

73.    The economic and legal literature recognizes that unlawful overcharges in a component normally result in higher prices for products which contain that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar has stated in his treatise, Federal Antitrust Policy, The Law of Competition and Its Practice (1994) and 564:

> A monopoly overcharge at the top of a distribution chain generally
> results in higher prices at every level below. For example, if
> production of aluminum is monopolized or cartelized, fabricators
> of aluminum cookware will pay higher prices for aluminum. In

most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

74.     Similarly, two other antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."

75.     Just as DRAM can be physically traced through the supply chain, so can its price be traced to show that changes in the prices paid by direct purchasers affected paid by indirect purchasers of DRAM.

## VIII.   DEFENDANT'S ILLEGAL CONDUCT

76.     Defendant and its co-conspirators have engaged in a course of illegal conduct constituting and effectuating a contract, combination, trust or conspiracy, the effect of which was to illegally raise the prices at which they sold DRAM.

77.     Defendant and its co-conspirators, through their officers, directors and employees, effectuated the aforesaid conspiracy between themselves by, among other things:

a.     Participating in meetings and conversations, including through various trade association and committees, to discuss the prices of DRAM in the United States;

CLASS ACTION COMPLAINT                                                          16

b. Agreeing, during those meetings and conversations, to charge prices at specified levels and otherwise to increase and maintain prices of DRAM sold in the United States;

c. Issuing price announcements and quotations in accordance with the agreements reached; and

d. Selling DRAM to various customers in the United States at non-competitive prices.

78. Defendant and its co-conspirators' contract, combination, trust or conspiracy was centered in, carried out, effectuated and perfectly mainly in the State of California. Therefore, all members of the Class, whether or not California residents, are entitled to recover under California law.

**B. Hitachi's Conduct**

79. Defendant's employees regularly communicated with competitors about prices by phone and in person, and shared competitors' information with their supervisors.

80. Employees of Hynix, Samsung and Siemens note communications with Hitachi employees regarding target DRAM prices for OEMs.

81. Defendant's employees met with employees from Micron and Infineon to discuss their common business issues.

82. Defendant's employees exchanged prospective pricing information with employees from Hynix, Micron, Infineon, Nanya, NEC and Samsung through "contacts" at each company.

83. Defendant knew that "sharing" this price information and price planning was illegal. One Hitachi employee noted that "you are technically not allowed to know or discuss price matters on our products" while Defendant's employees continued to exchange just such information. For example, a Hitachi employee provided NEC prospective pricing information while explicitly noting that Hitachi was not supposed to exchange pricing with NEC "as yet."

84.     The European Commission fined Hitachi over €20.4 million for coordinating price levels and quotations with Infineon, Hynix, Samsung, NEC, Toshiba, and Nanya for DRAM sold in the European Economic Area from November 9, 1998, to June 15, 2002.

## C.     Samsung's Conduct

85.     In sword evidence, Samsung acknowledged that 48 of its executives and employees may have obtained or received competitive information and provided a list of 30 additional executives and personnel who may also have been involved.

86.     Samsung Semiconductor and Samsung Electronics Co. pleaded guilty to criminal charges in November 2005, and paid a $300 million fine. The guilty plea covered the time period April 1, 1999, to June 15, 2002, wherein Samsung conspired "to fix the prices of DRAM sold to certain computer and server manufacturers." Affected customers included Dell, Compaq, Hewlett Packard, Apple, IBM and Gateway.

87.     Samsung employees Sun Woo Lee, Yeongho Kang, and Young Woo Lee entered guilty pleas in April 2006. These guilty pleas covered various periods from as early as January 1, 1998 until or on about June 15, 2002, wherein these individuals conspired "to fix the prices of DRAM sold to certain computer and server manufacturers in the United States."

88.     Another Samsung employee, Young Hwan Park pleaded guilty in December 2006. This guilty plea covered the period April 1, 2001, until on or about June 15, 2002, wherein this individual conspired "to fix the prices of DRAM sold to certain OEMs."

89.     In September 2006, Samsung's Thomas Quinn pleaded guilty "to fix[ing] the prices of DRAM sold to certain OEMs."

## D.     Hynix's Conduct

90.     Hynix has acknowledged that at least 15 of its executive had contacts with competitors related to pricing of the DRAM market in general. Beyond these identified executives, Plaintiffs have identified at least 25 additional Hynix personnel who were similarly immersed in the conspiracy.

91.     In May 2005, Hynix Semiconductor, Inc. pleaded guilty and was fined $185 million. The guilty plea covered the period April 1, 1999, to June 15, 2002, wherein Hynix

1  "conspired to fix the prices of DRAM to certain computer and server manufacturers." Hynix
2  admitted that the affected customers included Dell, Compaq, Hewlett Packard, Apple, IBM, and
3  Gateway.
4      92.    Hynix employees D.S. Kim (Senior Vice President and General Manager of
5  Worldwide Sales and Marketing), C.K. Chung (Director of Worldwide Strategic Account Sales),
6  K.C. Suh, and C.Y. Choi entered guilty pleas in March 2006. These guilty pleas covered various
7  periods from April 1, 2001, until on or about June 15, 2002, and acknowledged that these
8  individuals "conspired to fix the prices of DRAM to certain computer and server manufacturers."
9  Affected customers included Dell, Compaq, Hewlett Packard, Apple, IBM, and Gateway.
10     93.    The following are examples of Hynix's illegal behavior:

    a.   C. K.. Chung collected pricing information from subordinates and
        competitors and relayed that information to D.S. Kim.

    b.   Paul Palonsky, a salesperson with responsibility for the IBM account,
        acknowledged in sworn testimony that he gathered competitor price
        information "directly from competitors, including Samsung, Micron,
        Infineon, Hitachi, Toshiba, Elpida, LG, and NEC."

    c.   Hynix was aware of Samsung and Micron prices before it submitted a bid
        to Apple in August 2001.

    d.   Also in 2001, a Hynix email refers to the artificial product shortage
        created by Micron, and states that Micron will follow Samsung or Hynix if
        Apple accepts a price increase.

**E.    Infineon's Conduct**

    94.    Infineon has acknowledged that at least 16 of its executives had pricing-related
contracts with DRAM competitors. Plaintiffs have identified 24 Infineon personnel who were
engaged in conspiratorial conduct.

    95.    Infineon Technology AG pleaded guilty in October 2004, and was fined $160
million. The guilty plea covered the time period July 1, 1999, to June 15, 2002, wherein Infineon

conspired "to fix the prices of DRAM sold to certain computer and server manufacturers."
Affected customers included Dell, Compaq, Hewlett Packard, Apple, IBM, and Gateway.

96.     Four Infineon executives, Rudd Corwin, Heinrich Florian, Gunter Hefner and
Peter Schaefer, pleaded guilty in December 2004. These guilty pleas covered various periods
from as early as July 1, 2001, until on or about June 15, 2002, wherein these individuals
participated "in an intentional conspiracy to fix prices in the DRAM market."

97.     An example of Infineon's illegal behavior is that Infineon employees exchanged
emails discussing competitors Toshiba, Samsung, and Micron and their price targets to Dell.

F.     **Elpida's Conduct**

98.     Plaintiffs have identified at least 50 Elpida employees who participated in
conspiratorial conduct during the class period. Plaintiffs have identified at least 12 NEC
employees who participated in conspiratorial conduct during the class period.

99.     In January 2006, Elpida pleaded guilty and, with its parent companies, NEC and
Hitachi, paid fines $84 million. The guilty plea covered the time period April 1, 1999, to June 15,
2002, wherein Elpida conspired "to fix the prices of DRAM sold to certain computer and server
manufacturers." Affected customers included Dell, Compaq, Hewlett Packard, Apple, IBM and
Gateway.

100.     Moreover, Elpida was charged with and pleaded guilty to carrying out a bid-
rigging conspiracy by:

>    Participating in meetings, conversations, and communications in the
>    United States and elsewhere to discuss allocating (i.e., dividing up) a bid
>    offered by Sun among themselves;
>    Agreeing, during those meetings, conversations, and communications to
>    allocate a bid offered by Sun;
>    Allocating, in accordance with the agreements reached, a bid offered by
>    Sun among themselves, denying Sun a competitive price;
>    Participating in meetings, conversations, and communications, to submit
>    complementary bids to ensure the success of their agreements; and

1      Submitting complementary bids for one lot of a particular product,

2      denying Sun a competitive price.

3      101.    D. James Sogas, an Elpida employee and former Hitachi employee, pleaded guilty

4   in December 2006. This guilty plea covered the period April 1, 2001, until on or about June 15,

5   2002, wherein Mr. Sogas conspired "to fix the prices of DRAM sold to certain original

6   equipment manufacturers."

7      102.    An example of Elpida's illegal behavior is that an Elpida employee wrote emails

8   saying that she confirmed with Samsung and Infineon regarding their prices to Hewlett Packard,

9   and suggested that Elpida bid the same price.

10  **G.    Mosel Vitelic's Conduct**

11     103.    Plaintiffs have identified at least 16 Mosel employees who participated in

12  conspiratorial conduct during the class period. Five Mosel executives asserted their Fifth

13  Amendment rights: Rajit Shah (Vice President of Worldwide Sales & Marketing); Ron Farrell

14  (Manager, Product Marketing); Mohammed Iqbal (Director, Memory Products, Marketing); Kim

15  Michael Ramirez (Manager, Strategic Marketing, Special DRAMs); and Nathan Handelsman

16  (Market Research Analyst).

17     104.    In May 2002, Thomas Chang admitted that Mosel "had reached an agreement

18  with Hynix and Samsung to push up DRAM prices to US $3 a chip by stopped dumping." Chang

19  continued: "Hynix and Samsung executives visited Mosel Vitelic and Nanya Technology Corp.

20  recently to discuss the agreement."

21     105.    Using information supplied by competitors, Mosel Vitelic implemented a formal

22  price index system to track DRAM prices by vendor.

23     106.    The Director of Marketing emailed competitor provided price guidelines to Mosel

24  Vitelic employees and advised them to negotiate prices accordingly

25  **H.    Nanya's Conduct**

26     107.    Plaintiffs have identified at least 10 Nanya employees who participated in

27  conspiratorial conduct during the class period. Three Nanya executives asserted their Fifth

28

Amendment rights: Michael Walsh (Strategic Accounts Manager); David Dwyer (European Sales & Marketing Manager) and Brian Donahue (North America Sales & Marketing).

108.   Michael Walsh provided a 25-page spreadsheet detailing Nanya's price targets at Compaq for the next month to a former Hitachi employee, Jim Sogas, who later pleaded guilty to his involvement in the DRAM conspiracy.

109.   An official at Nanya was also quoted in the press discussing anticompetitive measures:

> "Everyone is feeling the need of cutting production," said Charles Kau, an executive vice president with Linko-based Nanya Technology. "As of how to engage in the cut is an issue that needs to be discussed. Nanya is willing to cooperate in such a cut," he added.

## I.   Micron's Conduct

110.   Micron and its executives, except Regional Sales Manager Alfred Censullo, all escaped criminal charges because Micron turned on Defendant and co-conspirators and entered the Department of Justice's Corporate Leniency Program. Mr. Censullo pleaded guilty to an obstruction of justice charge, whereby Censullo admitted to having withheld and altered documents responsive to a grand jury subpoena served on Micron.

111.   That Micron admitted its participation in a conspiracy to the DOJ is not surprising: Micron acknowledged at least 31 of its executives and other employees had conspiratorial contacts with Hitachi and its co-conspirators, including Hynix, Infineon, Samsung, Elpida, NEC, Mosel Vitelic, Nanya, Winbond, and Toshiba, with regard to at least the following customers: Apple, Dell, Compaq, IBM, Gateway, Sun, Cisco, Thomson, Seagate, Hewlett Packard, and Maxtor.

112.   Despite the fact that Micron's amnesty application was accepted, Micron's Vice President of Worldwide Sales, Michael Sadler, took the Fifth Amendment at his disposition in this case. Mr. Sadler traveled the world discussing inventory pullbacks, production decreases,

and prices with Micron's competitors. In addition, Mr. Sadler was copied on hundreds of internal emails in which employees discussed their illegal activities.

113.    The following are examples of Micron's illegal behavior:

a.      Mr. Sadler encouraged Keith Weinstock, an IBM account manager at Micron to develop contacts at competitors. Mr. Weinstock spoke regularly to his counterpart at Hynix, discussing pricing information for Samsung, Infineon, Toshiba, and others.

b.      Micron employee Bill Lauer kept a spreadsheet with competitors' prices at the major OEMs and asked sales representatives for those accounts to keep competitors' pricing information up-to-date in real time.

## IX.    ACTIVE CONCEALMENT

114.    Throughout and beyond the conspiracy, Defendant and its co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiffs. Defendant and its co-conspirators conducted their conspiracy in secret and publicly provided pretextual and false justifications regarding their price increases.

115.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendant and its co-conspirators were violating the antitrust laws as alleged herein until shortly before class action litigation against conspiracy members commenced in 2002.

116.    To ensure the conspiracy's effectiveness, Defendant and its co-conspirators extended the conspiracy beyond the contract market and into the DRAM spot market.

117.    As a result of the active concealment of the conspiracy by Defendant and its co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## X.    VIOLATIONS ALLEGED
### First Claim for Relief
### (Violation of Section 1 of the Sherman Act)

118.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

119. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1998, and continuing through at least December 31, 2002, the exact dates being unknown to Plaintiffs, Defendant and its co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for DRAM in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendant and its co-conspirators did those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    a. To fix, raise, maintain, and stabilize the price of DRAM;

    b. To allocate markets for DRAM among themselves;

    c. To submit rigged bids for the award and performance of certain DRAM contracts; and

    d. To allocate among themselves the production of DRAM.

121. The combination and conspiracy alleged herein has had the following effects, among others:

    a. Price competition in the sale of DRAM has been restrained, suppressed, and/or eliminated in the United States;

    b. Prices for DRAM sold by Defendant and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

    c. Those who purchased DRAM directly or indirectly from Defendant and its co-conspirators have been deprived of the benefits of free and open competition.

122. Plaintiffs have been injured in their business and property by paying more for DRAM purchased indirectly from Defendant and its co-conspirators than they would have paid in the absence of the combination and conspiracy, including paying more for products in which

---

DRAM is a component, as a result of higher prices paid for DRAM by the manufacturers of those products.

## Second Claim for Relief
## (Violation of the California Cartwright Act)

123. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

124. Defendant and its co-conspirators' contract, combination, trust or conspiracy was centered in, carried out and perfected mainly within the State of California, and injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

125. Beginning at a time presently unknown to Plaintiffs, but at least as early as January 1, 1998, and continuing thereafter at least up to and including December 31, 2002, Defendant and its co-conspirators entered into and engaged in a continuing unlawful trust I restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendant and each co-conspirator acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, and allocate markets for, DRAM at supra-competitive levels.

126. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendant and its co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for DRAM.

127. For the purpose of forming and effectuating the unlawful trust, Defendant and its co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following:

    a. To fix, maintain, and stabilize the price of DRAM;

    b. To allocate markets for DRAM amongst themselves;

    c. To submit rigged bids for the award and performance of certain DRAM contracts; and

    d.    To allocate amongst themselves the production of DRAM.

128.    The combination and conspiracy alleged herein has had the following effects, among others:

        a.    Price competition in the sale of DRAM has been restrained, suppressed, and/or eliminated in the United States;

        b.    Prices for DRAM sold by Defendant and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

        c.    Those who purchased DRAM directly or indirectly from Defendant and its co-conspirators have been deprived of the benefits of free and open competition.

129.    Plaintiffs and the other members of the Class paid supra-competitive, artificially inflated prices for DRAM and products containing DRAM.

130.    As a direct and proximate result of Defendant and its co-conspirators' unlawful conduct, Plaintiffs and Class members have been injured in their business and property because they paid more for DRAM and products containing DRAM than they otherwise would have paid in the absence of Defendant and its co-conspirators' unlawful conduct. As a result of Defendant and its co-conspirators' violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief
### (Violation of the California Unfair Competition Law)

131.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

132.    Defendant and its co-conspirators' contract, combination, trust or conspiracy was centered in, carried out and perfected mainly within the State of California, and injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

133.    Beginning on a date unknown to Plaintiffs, but at least as early as January 1, 1998, and continuing thereafter at least up through and including December 31, 2002, Defendant and its co-conspirators committed acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.

134.    This Claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from the Defendant and its co-conspirators for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

135.    The Defendant and its co-conspirators' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentation, practices and non-disclosures of Defendant and its co-conspirators, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following:

    a.    The violations of Section 1 of the Sherman Act, as set forth above;

    b.    The violations of Section 16720, *et seq*., of the California Business and Professions Code, as set forth above;

    c.    Defendant and co-conspirators' acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

    d.    Defendant and its co-conspirators' acts ad practices are unfair to consumers of DRAM in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

e.     Defendant and its co-conspirators; acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

136.     Plaintiffs and each Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant and its co-conspirators as a result of such business acts or practices.

137.     The unlawful and unfair business practices of Defendant and each co-conspirator, as described above, have caused Plaintiffs and Class members to pay supra-competitive and artificially-inflated prices for DRAM and products containing DRAM. Plaintiffs and Class members suffered injury in fact and lost money or property as a result of such unfair competition.

138.     The conduct of Defendant and its co-conspirators, as alleged in this Complaint, violated Section 17200 of the California Business and Professions Code.

139.     As alleged in this Complaint, Defendant and its co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendant and co-conspirators unfair competition. Plaintiffs and Class members are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant and its co-conspirators as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

### Fourth Claim for Relief
### (Violation of State Antitrust and Unfair Competition Laws)

140.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint. Plaintiffs have satisfied all notice requirements contained in any of the laws enumerated below.

141.     By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Alabama Code § 8-10-1 *et seq.*

142.     By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Arizona Revised Stat. § 44-1401 *et seq.*

143. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of California Bus. & Prof. Code § 16700 *et seq.* and Cal. Bus. & Prof. Code § 17200 *et seq.*

144. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. § 28-4503 *et seq.*

145. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Iowa Code § 553.1 *et seq.*

146. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. § 50-101 *et seq.*

147. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10§ 1101 *et seq.*

148. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.773 *et seq.*

149. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Minnesota Stat. § 325D.52 *et seq.*

150. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1 *et seq.*

151. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat § 59-801 *et seq.*

152. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A *et seq.*

153. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann § 57-1-1 *et seq.*

154. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of North Carolina Cent. Code § 75-1 *et seq.*

155. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01 *et seq.*

156. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of the Pennsylvania common law.

157. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1 *et seq*. Part of the conspiracy to restrain trade or commerce took place in South Dakota because, *inter alia*, computer maker Gateway, Inc. was headquartered in South Dakota during the class period.

158. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Tennessee Code Ann. § 47-25-101 *et seq*.

159. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453 *et seq*.

160. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of West Virginia § 47-18-1 *et seq*.

161. By reason of the foregoing, Defendant and its co-conspirators have entered into agreements in restraint of trade in violation of Wisconsin Stat. § 133.01 *et seq*.

162. As a direct and proximate result of Defendant and its co-conspirators' unlawful conduct, Plaintiffs and Class members have been injured in their business and property because they paid more for DRAM and products containing DRAM than they otherwise would have paid in the absence of Defendant and its co-conspirators' unlawful conduct.

163. As a result of Defendant and its co-conspirators' violations of the laws listed above, Class members seek damages and the costs of suit, including reasonable attorneys' fees.

**Fifth Claim for Relief**
**(Violation of State Consumer Protection and Unfair Competition Laws)**

164. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint. Plaintiffs have satisfied all notice requirements contained in any of the laws enumerated below.

165. Defendant and its co-conspirators engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

166.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471 *et seq.*

167.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code § 4-88-101 *et seq.*

168.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Bus. & Prof. Code § 17200 *et seq.*

169.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901 *et seq.*

170.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*

171.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480 *et seq.*

172.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601 *et seq.*

173.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kansas Stat. § 50-623 *et seq.*

174.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Louisiana Rev. Stat. § 51:1401 *et seq.*

175.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in connection with DRAM that was indirectly purchased primarily for personal, family, or household purposes in violation of 5 Maine Rev. Stat. § 207 *et seq.*

176.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana Code § 30-14-101 *et seq.*

177.     Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Rev. Stat. § 59-1601 *et seq.*

178.     Defendant and its co-conspirators have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*

179.   Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law § 349 *et seq*. Specifically,

    a.    Defendant and its co-conspirators engaged in trade or commerce in New York;

    b.    Defendant and its co-conspirators secretly agreed to raise prices by direct agreement on bids to customers located in New York and through artificial supply restraints on the entire DRAM market;

    c.    New York consumers were targets of the conspiracy;

    d.    The secret agreements were not known to New York consumers;

    e.    Defendant and its co-conspirators omitted material information that made the statements which they made materially misleading, and also made materially misleading affirmative statements about the real cause of price increases;

    f.    Because of Defendant and its co-conspirators' unlawful trade practices in the State of New York, Plaintiffs and other Class members who indirectly purchased DRAM have been injured because they paid more for DRAM than they would have paid in the absence of Defendant and its co-conspirators' unlawful trade acts and practices.

180.   Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq*.

181.   Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Rev. Stat. § 646.604 *et seq*.

182.   Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in connection with DRAM that was indirectly purchased primarily for personal, family, or household purposes in violation of Rhode Island Gen. Laws § 6-13.1-1 *et seq*. Specifically,

    a.    Defendant and its co-conspirators engaged in trade or commerce in Rhode Island;

b.    As alleged herein, Defendant and its co-conspirators engaged in acts or practices that were unfair or deceptive to natural persons purchasing DRAM for personal, family and household purposes;

c.    As alleged herein, Defendant and its co-conspirators used methods, acts or practices which mislead or deceive members of the public in a material respect about the true reasons for the price of DRAM;

d.    Rhode Island consumers were injured by Defendant and its co-conspirators' actions.

183.    Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code Laws § 39-5-10 *et seq.*

184.    Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah § 13-11-1 *et seq.*

185.    Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451 *et seq.*

186.    Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101 *et seq.*

187.    Defendant and its co-conspirators have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyoming Stat. § 40-12-105 *et seq.*

188.    Class members in the states listed above paid supra-competitive, artificially inflated prices for DRAM. As a direct and proximate result of Defendant and its co-conspirators' unlawful, unfair, unconscionable, deceptive and misleading conduct, Plaintiffs and Class members in the identified states have been injured in their business and property in that they paid more for DRAM than they otherwise would have paid in the absence of Defendant and its co-conspirators' unlawful, unfair, unconscionable, deceptive and misleading conduct.

189.    As a result of Defendant and its co-conspirators' violations of the laws listed above, the members of the Class in the states listed above are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant and its co-conspirators as a result of such

business practices, including compensable damages under New York law, and damages wherever else allowed by law.

### Sixth Claim for Relief
### (Unjust Enrichment and Disgorgement of Profits)

190.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

191.    Defendant and its co-conspirators have been unjustly enriched through overpayments by Plaintiffs and Class members and the resulting profits. Plaintiffs' detriment and Defendant and its co-conspirators' enrichment were related to, and flowed from, the conduct challenged in this Complaint.

192.    Defendant and its co-conspirators have accepted and retained these profits and benefits derived from Plaintiffs and Class members with the full knowledge and awareness that they result from their own wrongful conduct.

193.    Under California's unjust enrichment laws, Defendant and its co-conspirators should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members nationwide.

194.    Plaintiffs seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    That the Court determine that the Sherman Act, state antitrust law, and state consumer protection and/or unfair competition law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

a.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief;

b.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws identified in the Second and Fourth Claims for Relief herein;

c.   Violations of the state consumer protection and unfair competition laws identified in the Third and Fifth Claims for Relief herein; and

d.   Acts that unjustly enriched Defendants as set forth in the Sixth Claim for Relief herein.

C.   That Plaintiffs and the Class recover damages, as provided by state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendant;

D.   That Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) communicating or causing to be communicated to any other person engaged in the sale of DRAM, information concerning bids of competitors;

E.   The Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendant as a result of its acts of unfair competition and acts of unjust enrichment;

F.   That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.   That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

H.   That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

# JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury on all issues triable of right by jury.

Respectfully submitted,

Dated: December 5, 2012

THE TERRELL LAW GROUP

REGINALD TERRELL, ESQ.

REGINALD TERRELL, ESQ.
THE TERRELL LAW GROUP
Post Office Box 13315, PMB #148
Oakland, California 94661
Telephone: (510) 237-9700
Facsimile: (510) 237-4616